EMILIO CASIANO CRUZ ET AL., Plaintiffs and Appellees, *v.* WATER RESOURCES AUTHORITY OF PUERTO RICO, Defendant and Appellant.

No. R-68-77.     Decided December 7, 1970.

*José Antonio Arabía* and *Luis A. Lugo, Jr.* for appellant. *Luis A. Negrón Lizardi* for appellees.

PER CURIAM: The Water Resources Authority appeals from the judgment rendered in this case which held it liable for the occurrence of a fire in the property of Carlos Caraballo. The trial court concluded that "the aforementioned lines conducted electric power, and because of the expansion or distance between one pole and another and of the weight of the wires on Caraballo's property, the wires in question split apart or broke on March 21, 1965, as a result of which said wires fell on the property of the aforementioned Carlos Caraballo and caused a fire which spread out through all the ward moving over to plaintiffs' property and causing damages to the latter." By virtue thereof the trial court ordered the Authority to pay the damages suffered by appellees, which amount to $1,100 plus $500 for attorney's fees.

We conclude that the trial court erred; that the judgment should be reversed and the complaint dismissed in this case. Hereinafter we state the reasons underlying this ruling.

Appellant assigns that the trial court erred in concluding that on March 21, 1965, some wires belonging to the Authority broke, falling to the ground originating a fire which caused damages to appellees, and in imposing attorney's fees.

Blanca Quiñones Vélez testified for appellees in regard to the origin of the fire. She said that on March 21, 1965, at about three in the afternoon she was sitting under a tree in her house yard at Las Vegas ward in Yauco when "all of a sudden a cable of some electric lines which went along Emilio Casiano's property exploded and fell down on Carlos Caraballo's sugarcane" where "there was a dry tree and the cable

fell on the dry tree and it caught fire." When the cable broke the witness heard "like an explosion"; that when it fell it set the trumpet tree on fire and said fire spread all over the ward; that it kept burning for one week; that at that time "it was windy" and the day was "dry"; that from 3:30 to 4:00 P.M. a brigade from the Water Resources Authority arrived together with the firemen but "they didn't do anything"; that for the purpose of making the repairs after the fire, her current as well as that of the entire ward was "cut off"; that she and the ward were receiving current since before the fire; that "the cable was tight and it burst"; that it did not come in contact with another cable; the Authority's brigade remained at that place until 6:30 in the afternoon.

Casiano Cruz testified that "On March 21, at about 1:00 to 3:00 P.M. more or less, I was at my farm at Vegas, which is a cattle farm, and the lady here lives on a hill where there are two poles"; that when the fire broke out "I was about three hectometers away and I heard when the cable came sliding right down getting entangled on the different trees."

.The testimony of these two witnesses is the only evidence which appellees have regarding the origin of the fire.

Let us see now appellant's evidence. Its Lines Supervisor, Max García, testified that "we were notified that at the Vegas ward there was a wire on the ground and I went with a brigade to investigate, and what we found was a telemetric cable"; that said cable fell when a dried up tree got loose "and it fell over the tree at Caraballo's property. Two lines of 38000 volts and a secondary line of 110, and the telemetric cable run through that property"; that the cable in question was halfway between the span from tower to tower; that the telemetric is a thick cable which "carried several strands of thin wire covered with rubber which was used to record the water levels of the dam"; that said cable "runs through a line of poles which are about 30 feet apart" supported by a steel cable known as a messenger cable and also held to each pole

by a clamp; that they found the telemetric cable, "it was in good condition but apparently it was trapped . . . it was on the ground. When the tree fell over it the clamp broke and trapped it against the ground. When we arrived we had to cut the tree to remove the cable"; that this cable "was just scorched . . . . We took it and we raised it"; that they did not do anything else; that the base of the tree was burned; that there was no other cable on the ground; that the lines of 38000 volts were in good condition, "in perfect condition and they ran over the place where they fell"; that they did not have to be repaired; that these lines carry electric power to Yauco's substation No. 2; that if they fall "The town of Yauco would be left without service"; that the day of the fire said town had service; that there was a secondary line to give service to a housing project in construction but that the same was not functioning the day of the fire because it had not been connected yet; that according to the records of interruptions which the Authority keeps there was no interruption of the services it renders through Yauco's substation No. 2; that on the day of the fire "there was an interruption here that same day, March 21, at about eleven in the morning. There was a large fire in Yauco, in a sugarcane plantation that is at the back . . . . It crossed Highway No. 2, took line number seven hundred and burnt the tower of thirty thousand"; that line 700 does not run through Las Vegas ward, the ones which run through that place are lines 1300 and 2400. That the secondary line for the housing project began to operate on September 21, 1965; that the telemetric cable "has no more than 30 or 40 volts."

Rafael Alfonso Tobal, Service Supervisor of the Yauco section testified that witness Blanca Quiñones has electric service since September 25, 1965, and not before because "the electric service had not yet been installed" for the locality where she lived.

Expert Félix Agostini Rodríguez testified that he inspected the place of the fire; that "That inspection took place in or about March or April nineteen sixty-five, in connection with a fire which occurred in a sugarcane plantation nearby. In said inspection I observed that the lines which run through that place are two transmission lines of thirty-eight thousand volts from conductor to conductor and of twenty-two thousand volts from conductor to ground. Specifically lines one thousand three hundred and one thousand four hundred of the Water Resources. In addition to said lines, there were telemetric control cables which controlled the operations of the lake dams of the Yauco plant and transmitted telephone or telemetric signals to the devices which control the movement of the lake dams. Said cable is separated from the transmission lines and runs through a series of thirty-foot poles of the ones which are usually called service poles. The transmission lines were affixed to two towers with gates of two wooden poles, usually known as Tower H., and the height of said poles was sixty feet and each one was at the top of a hill and between the two hills there was a lowland, and in said lowland the cables of the transmission line ran above the ground at a distance of more than fifty feet and no tree could be noticed growing immediately under the line. There was a dry tree towards the border of said lowland, the base of which was burnt and the tree rested on the aforementioned telemetric cable. Said cable had been torn away from the support of the thirty-foot pole closest to the tree which was on the ground and it still was within the support which held the messenger cable which held the whole cable. Said cable's station appeared to be burnt, the outer covering was burnt on the point closest to the ground where the dry tree rested on said cable, but the cable by itself was intact, as well as the messenger cable which held it. Those are the observations gathered on the day of the inspection of the aforementioned place"; that the covering of the telemetric cable "had been burnt by external

heat. I think that when the grass on that land took fire and burnt the base of the tree, the latter fell over the cable tearing away its supports and getting burnt with the heat of the fire"; that "A telemetric cable is so called because it transmits signals at a distance. Those signals are used to control equipment, devices from one far or remote point to another. Said cable has the appearance of a telephone cable of several couples. Couples are thin conductors which go within a paper insulation and usually as a whole there are from twelve to nineteen couples, and including the thick ones. In this case it was a cable of twelve couples. The thin conductors are insulated with a paper and everything is within a rubber or polyethylene covering. In this case the covering was made of canvas and said covering is used, first, to give mechanical strength to the conductors, since because of their thin condition they are too flexible, and second, to give mechanical strength and to hold by the supports the messenger which carries the cables together. Likewise said covering has the further purpose of protecting the conductors therein from the inclemencies of the weather, such as rain, humidity, sun, and heat. The current which this cable usually carries is the current of the signal impulse and normally such impulses are from fifty to sixty volts and they are not continuous impulses, but intermittent. That is, when the central issues an order to the equipment which is in the plant, said order is sent as an electrical impulse and it is transmitted through the thin conductors which are inside the covering. That makes pressure on the relay at the point and said relay puts the controlled equipment into operation"; that the current running through the telemetric cable does not move the heavy gates of the dam, it rather acts over the relay which starts the motors of the gate "and that the relay receives separate energy from the plant itself."

Several photographs taken on the day following the day of the fire and appellant's records admitted in evidence tend to

corroborate these witnesses testimony for they show that (1) the high tension lines remained in their position, the telemetric cable had fallen down, as well as a thick tree trunk beside one of the poles of said lines, and the records show that there was no interruption in the service of the high tension lines which run through the place of the fire, and that the low tension line started to work a long time after the fire, and that Blanca Quiñones' house did not have electric service until months after the fire.

We do not think that the testimony of witness Blanca Quiñones was worthy of credit. She testified that a cable "exploded all of a sudden" when at the place of the fire no electric cable appeared broken, and the only thing there was, was a telemetric cable which got loose from the pole and had fallen to the ground but without breaking. She said that the fire lasted one week. Nevertheless she admitted that that same afternoon the employees of the Authority climbed the poles and they remained only three hours at the place of the fire. They left as soon as they raised and replaced the telemetric cable on the pole from where it had fallen. It is unreasonable to assume that the Water Resources brigade left the place of the fire that same afternoon and did not return to the place if it were true that the fire lasted one week. It is also unreasonable to assume that the firemen could not control the same long before. This witness said earlier that her husband's name was Manuel Jiménez, but when she returned to the witness stand she testified that she was married to Manuel Quiñones. She said that the electric service of her house and those of the other neighbors had been suspended when appellant's employees came to make the necessary repairs, service which she enjoyed since long before the fire. On the contrary, the evidence showed that the witness did not have electric service before the fire, but that she started to receive the same some months after the disaster.

On the other hand, appellees' evidence does not specify that the cable allegedly broken was a cable of the high-tension lines. No other evidence whatsoever was presented to confirm that the fallen cable was one of such lines. Therefore, we do not find support in the evidence for the trial court's conclusion to the effect that "*the aforementioned lines* conducted electric power, and because of the expansion or distance between one pole and another and of the weight of the wires on Caraballo's property, *the wires in question split apart or broke* on March 21, 1965, as a result of which *said wires fell on the property* of the aforementioned Carlos Caraballo and caused a fire which spread out through all the ward moving over to plaintiffs' property and causing damage to the latter."

The evidence shows that none of the cables of the high-tension line had been broken, falling over the sugarcane plantation thus causing the fire. The secondary line in construction to give services to the neighborhood houses could not cause the fire either because the day of the fire that line was dead and not in service. What's more, this line did not start functioning until several months later.[1]

From the testimony itself of Blanca Quiñones, as well as from Max García's testimony, it appears that the cable which fell down was the telemetric cable. We do not believe for several reasons, that this fact was the cause of the fire. There was evidence to show that the voltage of this line could not cause the fire. It did not appear broken or "burst" as Blanca Quiñones said, but only its covering was scorched to the point that it could be readily raised and replaced on the pole from where it fell that same afternoon. Therefore it could not produce sparks or otherwise be the cause of the fire.

The most reasonable inference from the evidence as to the cause of the fall of the telemetric cable is that it was caused

---

[1] Notice that one of these lines is designated as the 2400 by witness Max García and as the 1400 by witness Félix Agostini Rodríguez.

by the trumpet tree when it collapsed as a result of the burning of its trunk. So that the cause of the fire necessarily could not be any of appellant's electric lines for when the tree detached the telemetric cable from one of its poles, the fire had already started, and it had burnt the trunk to such an extent that said tree fell down.

In view of the foregoing, we conclude that the evidence did not establish any causal relationship between the damage caused as a result of the fire and appellant's electric lines. For this reason the doctrine of *res ipsa loquitur* is not applicable. Even assuming that the doctrine of *res ipsa loquitur* were applicable, the permissible inference which could have arisen, was amply rebutted by the evidence introduced by appellant. *Burgos Quiñones* v. *Water Resources Auth.*, 90 P.R.R. 597, 605, 606 (1964). *Cf. Prieto* v. *Maryland Casualty Co.*, 98 P.R.R. 583 (1970).

Therefore, the judgment rendered by the Superior Court, Ponce Part, on February 14, 1968, will be reversed, and the complaint dismissed.

The Chief Justice, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra did not participate herein.